# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DURRELL SHAWNTA JONES, )<br>DEMETRIOUS ALLEN HALL, )<br>RANDY LA'SHEEN JONES, )<br>)<br>Defendants. ) | Case No. CR413-203 |

## REPORT AND RECOMMENDATION

Asserting a violation of their Fourth Amendment rights, defendants Demetrious Hall and Durrell Jones have moved to suppress all evidence seized at the time of their arrest on bank robbery charges, as well as all statements that constitute the tainted product of their alleged illegal arrest. These two defendants, together with defendant Randy Jones, also move to dismiss the indictment because of alleged misconduct by a government witness before the grand jury. The testimony presented at the suppression hearing fails to establish any violation of defendants' constitutional rights, or any abuse of the grand jury process.

# I. SUPPRESSION MOTION[1]

At around 8:30 a.m. on November 13, 2013, someone called in a bomb threat at the Midway Middle School in Liberty County, Georgia. Some seven minutes later, two black males attempted to rob the Interstate Federal Credit Union located on U.S. Highway 84, less than three miles from the middle school. The latter event, which was captured on the credit union's surveillance cameras, was foiled when the robbers were unable to gain entry through a door that locked behind an employee as she hurried inside the credit union. Both men ran into a wooded area and disappeared from view.

While other officers descended on the school and the credit union, Sgt. Gary Richardson continued to operate his unmarked patrol car along a roadway in the general vicinity of the events reported over the police radio. Richardson soon spotted a vehicle traveling at a fairly high rate of speed along a dirt road that ran behind the credit union. He caught up with the vehicle, a Chevrolet Captiva SUV, as it approached the stop sign

---

[1] The facts are drawn from the testimony of the four law enforcement officers called by the government at the hearing, all of whom are employed by the Liberty County Sheriff's Department: Sgt. Gary Richardson; Det. Steven Teel, Captain Orrin Nestor, and Deputy Julie Hibbler Buttress.

2

at the intersection where Charlie Butler Road dead ends into Highway 84.[2] He noticed that there were at least four occupants in the Captiva and that the rear seat passengers kept looking back at him when he pulled behind their vehicle. Sgt. Richardson further observed that the driver seemed uncertain about which way he wanted to go, as he kept maneuvering his vehicle back and forth slightly before proceeding. The driver then made a right turn without giving a signal. Richardson followed the Captiva as it headed east on Highway 84 toward I-95, saw it change lanes repeatedly as if trying to shake him, and observed it pull into an El Cheapo truck stop/gas station near the interstate. Richardson also turned into the truck stop and positioned his vehicle a short distance away so that he could continue to watch the Captiva and its occupants.

Although the Captiva had stopped by a fuel pump, no one got out of the vehicle to pump gas. After a few seconds passed, the front seat passenger (defendant Demetrious Hall) exited the vehicle, went inside the truck stop's convenience store briefly, and then came back and re-entered the Captiva. The driver (defendant Durrell Jones) then exited the vehicle

---

[2] The Captiva had a Chatham County license plate. Richardson testified that it was somewhat unusual for an out-of-town vehicle to be travelling along the unpaved road.

and went inside the store. At this point, Sgt. Richardson pulled his vehicle behind the Captiva, got out of his car, and approached the driver as he exited the store. Richardson, who had already determined that the Captiva was a rental vehicle, asked the driver to step to the rear of his vehicle and present his drivers license. Moments later, another passenger in the Captiva (Kendall Stevens) got out of the vehicle and quickly entered the store.

By this time, Det. Steven Teel arrived to assist Sgt. Richardson (who had earlier phoned Teel to say that he had spotted a suspicious vehicle and desired some back-up). Richardson briefed Teel about his observations and asked him to remain with the driver while he went inside to look for Stevens. The driver, Durrell Jones, claimed to have a valid license but said he did not have it with him. Teel ran a computer check on Jones' license and determined not only that it was suspended but that there was an outstanding warrant for Jones' arrest. Teel then placed Jones in his patrol car. Because Jones had stated that the Captiva had been rented by his aunt (who was not present), and because none of the other occupants were authorized to operate the vehicle, Teel determined that the Captiva

should be impounded and towed pursuant to standard sheriff's department protocol.

As Teel was dealing with the vehicle driver, Sgt. Richardson entered the store, located Stevens (the last vehicle passenger to go inside), and asked him to step back outside. By this point, a number of other law enforcement officers had arrived at the truck stop. Given his earlier decision to impound the Captiva, and given the officers' mounting suspicion that the vehicle was connected to the bank robbery, Det. Teel elected to get the remaining occupants out of the vehicle one at a time. Teel first asked defendant Hall to exit from the front passenger seat, explained that the vehicle driver had been placed under arrest, and sought Hall's permission to conduct a brief pat down. Hall consented to the frisk. Defendant Randy Jones was then asked to step from the back seat of the vehicle. Once the vehicle was secured, Teel's supervisor opened the glove box and found a police scanner and some binoculars. Apparently, all three passengers were secured in patrol cars while awaiting the arrival of FBI agents, who were then en route.

After the Captiva had been impounded and briefly inventoried, other sheriff's department personnel with more detailed knowledge of the bank robbery arrived on the scene. Captain Orrin Nestor and Deputy Julie Buttress had earlier viewed the bank's surveillance video and had paid close attention to the type of clothing worn by the robbers. Both officers positively identified certain clothing found in the Captiva -- a black insulated jumpsuit, an orange jacket (or sweater), and a black baseball cap with a brown brim -- as matching items of clothing clearly depicted on the surveillance video. All occupants of the vehicle were then formally arrested on suspicion of bank robbery.

Defendants make no claim that Sgt. Richardson violated their rights merely by catching up with the Captiva, following it to the El Cheapo gas station, and closely observing the behavior of its occupants. While Sgt. Richardson freely admitted that his initial interest in the vehicle was based solely on "a hunch," law enforcement officers are free to *investigate* their hunches; they just may not indulge their gut instincts or ill-defined suspicions as a basis for a Fourth Amendment seizure. But that is not what Sgt. Richardson did. Rather than acting precipitously upon some

6

vague, unsubstantiated "feeling" that the Captiva occupants might be the bank robbers, Sgt. Richardson simply watched and waited, biding his time until he could acquire additional, more concrete information about what the occupants were up to. The totality of his observations -- the nervous behavior of the back seat occupants upon his initial approach (who stared back at him repeatedly), the driver's hesitancy about which way to turn, the vehicle's frequent lane changes as it proceeded down Highway 84 (suggestive of an effort to elude him), the driver's pulling up to gas pumps at a service station but no one getting out to pump gas, and the fact that passengers eventually went inside the convenience store but then immediately returned to their vehicle -- only served to increase, rather than allay, Richardson's concerns that there was something very odd about the behavior of the vehicle occupants. Even then, Sgt. Richardson did not effect a seizure of the vehicle or detain any of its passengers.

Nor have defendants made any claim that Sgt. Richardson acted improperly by approaching the driver once he exited the Captiva and requesting to see his drivers license. Richardson had just witnessed the driver violate the Georgia traffic laws by failing to signal a right turn

before proceeding onto Highway 84.³ It is well settled that "a police officer may stop a vehicle when there is . . . probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles." *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (quotations marks and citation omitted). When the license check revealed that Durrell Jones was not only driving on a suspended license but that there was an active warrant for his arrest, the officers properly took him into custody. Durrell Jones, therefore, has no legitimate claim that his Fourth Amendment rights were violated at the time of his arrest. Nor has he shown that the search of the rental vehicle, which was lawfully impounded and inventoried pursuant to sheriff department policy,⁴ was constitutionally unreasonable.

---

³ Georgia law requires drivers to signal a turn in order "to alert the driver of a vehicle proceeding from the rear in the same direction or a driver of a vehicle approaching from the opposite direction." O.C.G.A. § 40-6-123(a)-(b). Under Georgia case law interpreting this statute, a motorist must signal a turn even when stopped at a stop sign or traffic light and the only nearby vehicle is an officer who stopped directly behind the motorist. *Georgia v. Reddy*, 511 S.E.2d 530, 532 (Ga. Ct. App. 1999); *Trippe v. Georgia*, 464 S.E.2d 655, 656 (Ga. Ct. App. 1995); *see also McBride v. Georgia*, 539 S.E.2d 201, 202 (Ga. Ct. App. 2000).

⁴ Law enforcement officers may conduct inventory searches of vehicles that have been impounded or that are otherwise in their lawful custody, provided the inventory is

Demetrius Hall has also failed to establish that his rights were violated when he was asked to step out of the Captiva or when it was subjected to a warrantless inventory search. First, because Hall was a mere passenger who lacked an ownership or possessory interest in the vehicle, he had no legitimate expectation of privacy in the interior of the vehicle sufficient to confer "standing" to object to its search. *United States v. Lee*, 586 F.3d 859, 864-65 (11th Cir. 2009); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008); *United States v. Smith*, 2008 WL 5332117 at * 3 (S.D. Ga. Nov. 10, 2008). A defendant challenging the validity of a search bears the burden of establishing his own reasonable expectation of privacy in the area invaded before he can invoke the protections of the Fourth Amendment. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998); *United States v. Hall*, 716 F.2d 826, 829 (11th Cir. 1983). As Hall has made no effort to establish that he had a privacy interest in the vehicle, he has no right to contest its search.

---

conducted pursuant to standardized government procedures. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991). Det. Teel testified that it was the established and customary practice of the Liberty County Sheriff's Department to inventory vehicles upon their impoundment. Defendants made no effort to rebut that testimony.

Even assuming Hall did have a reasonable expectation of privacy in the vehicle sufficient to challenge its search, he has not shown that the decision to impound and then inventory the contents of the vehicle violated the Constitution. All of the physical evidence that Hall seeks to suppress was found inside the vehicle (or inside the truck stop's bathroom).[5] Because the decision to impound and inventory the Captiva had been made prior to the officers having any contact with Hall, this evidence would inevitably have been discovered irrespective of the lawfulness of his later investigative detention and arrest. The evidence found in the Captiva, as well as the gun and drugs found abandoned in the bathroom, are therefore admissible at Hall's trial.

Hall, however, has not established that he was subjected to an impermissible seizure of his person or that his brief investigative detention was improper. Again, the officers had no encounter with Hall until Det. Teel asked him to step out of the vehicle. Teel was clearly justified in asking all remaining passengers to exit a vehicle that was being lawfully impounded. After Hall consented to a frisk, he was secured

---

[5] The officers recovered a pistol and some marijuana from a trash receptacle inside the truck stop's bathroom, after a customer reported having just overheard someone drop a metallic object in the receptacle.

in the back of a patrol car pending the arrival of additional investigators. This constraint on his freedom of movement clearly constituted a Fourth Amendment seizure. But, for the reasons stated earlier, by this point the officers had developed sufficient information to support a reasonable suspicion that the vehicle occupants were involved in the credit union robbery.

A determination of reasonable suspicion is based on the totality of the circumstances and all of the information available to the investigating officers. "It does not require officers to catch the suspect in a crime. Instead, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity, *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004), even if such activity is seemingly innocuous to the ordinary citizen." *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2004). Here, the government has pointed "to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] an intrusion . . . upon [Hall's] cherished personal security." *Terry v. Ohio*, 392 U.S. 1, 21, 25 (1968). Sgt. Richardson first encountered the Captiva along an unpaved road that ran behind the credit

union where a robbery had just occurred. The vehicle appeared to be moving fairly rapidly. As soon as Richardson caught up with the Captiva, the rear seat passengers began looking back at him in a nervous manner, and the driver seemed uncertain which way he wanted to go. After turning onto U.S. 84, the driver began switching lanes in a manner suggesting an attempt to evade the officer. The vehicle then pulled up to the fuel pumps at a service station, but no one pumped any gas. Instead, several occupants made brief trips in and out of the station's convenience store. These observations do not compel a conclusion that the vehicle occupants were engaged in criminal activity, but they certainly permit that conclusion. The strange behavior of the vehicle and its occupants, together with their proximity in time and location to the attempted robbery, furnished the officers with sufficient suspicion to justify their brief detention pending further investigation. The detention *was* brief, for soon other officers arrived who were able to confirm that items of clothing found in the Captiva exactly matched clothing worn by the robbers. Probable cause then arose to arrest all four occupants for the

attempted robbery of the credit union.[6]

## II. MOTION TO DISMISS

Defendants Hall, Durrell Jones, and Randy Jones all move to dismiss the indictment because FBI Special Agent Adam Rogalski misinformed the grand jury that a credit union employee observed guns in the hands of the two robbers, when in fact both witnesses to the attempted robbery denied seeing any firearms. (Docs. 96, 111, 114).

According to defendant Hall's brief, the transcript of the grand jury proceedings reflects that when the foreman asked a question about whether a firearm was brandished by the robbers, Agent Rogalski first stated that "'you can clearly see both weapons [on the surveillance video] as the individuals are running up to the bank.'" Doc. 96 at 3 (citing p.25, lines 7-8 of the grand jury transcript).[7] When the prosecutor then asked whether the employee was "genuinely affected" by that sight, the agent responded: "'She was, yes. The bank employee clearly saw the guns,

---

[6] Because defendants' post-arrest statements were not the fruit of any prior illegal detention or seizure, defendants have shown no ground for their suppression.

[7] The Court has not been furnished with a copy of the grand jury transcript, and therefore it must rely upon the quotations from defendant's brief.

13

knew it was a robbery, and did everything she could to secure the bank.'" *Id.* (citing p.25, lines 15-17).

It is undisputed that during interviews conducted by another FBI Agent (William Kirkconnell) some two weeks before Agent Rogalski's grand jury testimony, the two credit union employees who witnessed the attempted robbery both stated that they did not observe any firearms in the hands of the robbers. Reasoning that Rogalski "[p]resumably" had reviewed Agent Kirkconnell's written report of those interviews prior to his grand jury testimony, defendants assert, contradictorily, both that he was merely "mistaken" in his testimony and that he "knowingly committed perjury." Doc. 96 at 3, 4. When the Court pointed out at the motions hearing that there is an important difference between mistaken testimony and perjurious testimony, defense counsel essentially disavowed any claim that the agent willfully lied to the grand jury.

Agent Rogalski testified at the evidentiary hearing that he had never interviewed the two credit union employees and did not believe that he had read the FBI 302 reports of their interview prior to his grand jury testimony (although he conceded he may have done so). He explained that

14

when he testified before the grand jury it was his "belief" that the employees had seen a weapon in the hand of one of the robbers, for the bank surveillance video, which Rogalski had carefully reviewed, appeared to depict such a firearm.[8] The defendants have presented no evidence to dispute Agent Rogalski's testimony that his misstatement to the grand jury was inadvertent rather than intentional. The Court found Agent Rogalski to be sincere and believable, and it credits his testimony that he simply made a mistake when he appeared before the grand jury and did not willfully lie to that body.[9]

"[T]he possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct." *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th

---

[8] Other law enforcement officers who viewed the surveillance video also testified at the suppression hearing that, in their judgment, a gun could be seen in the hand of at least one of the robbers.

[9] The record reflects that even though the credit union employees apparently saw no weapons, they knew full well that the two masked men who approached the rear of the credit union intended to commit a robbery, they were fearful for their safety, and they immediately contacted the police.

Cir. 1985). While defendants have shown that Agent Rogalski misinformed the grand jury that a credit union employee had seen a firearm during the attempted robbery, they have not established that he committed perjury or that the prosecutor knew that the agent had mistakenly testified and deliberately failed to bring that error to the grand jury's attention. As neither the agent nor the prosecutor knowingly tried to deceive the grand jury, defendants have failed to make out a claim of grand jury abuse sufficient to require the dismissal of the indictment.

Nor have defendants shown that the agent's false testimony prejudiced their rights, for even though the employees did not see a weapon, Agent Rogalski properly informed the grand jury that the surveillance video appeared to depict a weapon in the hand of one of robbers. The grand jury, therefore, had sufficient information to make a probable cause determination that a firearm was brandished during the attempted armed robbery, as alleged in the first three counts of the indictment. Even if the evidence of firearm brandishment is not compelling, an indictment that is valid on its face is not subject to a challenge as to the reliability or competence of the evidence presented to

the grand jury. *United States v. Calandra*, 414 U.S. 338, 344-45 (1974) ("the validity of an indictment is not affected by the character of the evidence considered"); *Costello v. United States*, 350 U.S. 359, 363 (1956) (a court may not look behind the indictment to determine the sufficiency of the evidence upon which it is based).[10]

## III. CONCLUSION

Defendants have not shown the type of government misconduct before the grand jury that would warrant the dismissal of the indictment. Nor have they shown that they were subjected to an unreasonable search and seizure requiring the suppression of evidence. Their motions to suppress (docs. 43, 116) and motions to dismiss (doc. 96) should be **DENIED.**

**SO REPORTED AND RECOMMENDED** this  25th  day of November, 2014.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[10] Agent Rogalski further informed the grand jury that all four vehicle occupants had felony records. Defendant Hall notes that Rogalski erred, as he had only prior misdemeanor convictions. Hall does not claim that Rogalski deliberately misrepresented his criminal record. Nor has he made any effort to establish that this erroneous testimony was material to the grand jury's decision to indict, for even if Hall lacked any criminal record whatsoever, the evidence was sufficient to persuade the grand jury that Hall was likely involved in the scheme to rob the credit union.